Next matter is George v. Rehiel and the City of Philadelphia. Your Honors, may it please the Court, Sharon Swingle from the Department of Justice representing the individual federal defendants in this case, and I'd like to save three minutes for rebuttal. The District Court's denial of qualified immunity in this case was based on two basic errors. First, I think the District Court failed to apply the Supreme Court's clear holding in Iqbal that an individual Bivens defendant can only be held liable for his or her individual conduct. As the Supreme Court made clear, there is no precarious liability, and supervisory liability is a misnomer in this context. And so the District Court really lumped together both the individual defendants and the corporate defendants, and the conduct of each of these defendants. So the police got limited with the federal actors and the federal police actors were viewed as a single detention or a single force, that's what you are talking about. And then I think attributed to them the conduct of the Philadelphia police, and if we can look at them one by one, if you look at the first two TSA screeners, as you know... Well, they're not really arguing the first two, and the first one asks Mr. George to step into an area, a glassed off area, the second one apparently swabs the cell phone, and that's it. Exactly, exactly. And you're talking about 20 minutes to 30 minutes there. So just to be clear, the first two TSA defendants that he has sued are the line level screeners who screen him once he has been diverted for additional scrutiny. And he concedes that he does not challenge the propriety of his having been selected for additional screening. Sure. But isn't it plausible, and in fact, I want to ask, in your opening brief you say plaintiff has offered no allegations that support a plausible inference that the police operated as agents of the individual TSA employees or the TTF employees. Is it plausible that the supervisor of the two original TSA screeners arrived because  Absolutely, Your Honor. Is it plausible that the police show up because the TSA calls the police? Isn't that not a plot that for the same reason that it's plausible to say the TSA supervisor arrives, it's plausible that the police arrive because the TSA calls them and says come. Absolutely, Your Honor, but I want to be very clear here. The TSA is not the defendant here. We are talking about two screeners, and we don't know whether one of those screeners called the police, whether another TSA official called the police. Well, sure. There's some factual issue about which of the three or all three in agreement together contact the police. Or whether someone else entirely did it because they could have talked to another supervisor. A factual question. Well, with respect, Your Honor, it is the plaintiff's burden to come here and show that any of those individuals is somehow tied into some... Who else would be? That's part of the problem. And I also, if I may, Your Honor, I don't think there is support in the precedent or common sense for the notion that when an individual TSA screener sees things in a search that are of reasonable concern, and Your Honors are aware of what those items were, they were can't call a supervisor, or that the Fourth Amendment bars them from calling police. Nobody's suggesting that. Right. I am. What we are asking is, or at least I am, I don't want to trigger anybody else, you say there's just no plausible way to link the TSA to what the Philadelphia police did. And I'm asking you whether it isn't entirely plausible to believe that the police came and took Mr. George away because the TSA said, come get this guy, we've got concerns. They didn't come and put the man in cuffs and perp walk him through the airport randomly. They came because somebody called them. And isn't it plausible to believe it was the three, or one of the three, or all three together, who made that call because they wanted him detained for further questioning? Well, Your Honor, I will say a couple of things, if I may. First, TSA works very closely with local law enforcement officials for a variety of different purposes, completely apart from detention. And I think, certainly, there is no Fourth Amendment bar, or at least not within this court's clear precedent, that would prohibit a line-level screener who has questions from asking a police officer to come and ask some additional questions. And I think there is no way, based on these factual allegations, to distinguish between seeking the assistance of a police officer to ask some more questions. Does anything get said? Does anything at the scene get said that the facts as alleged are that the officer comes, cuffs Mr. George, hands behind his back, cuffs him, walks him away, and not a word is exchanged? Now I suppose you could say the TSA is so shocked it's speechless, the three people there can't even talk, they're so surprised. Or you could say, they say nothing because that's exactly what they expect. They expect that the police are going to come, and they expect they're going to walk him out and take him someplace different, in cuffs, because that's their intent. Take this mail, I'm not saying it's ill, it's an intent that's ill-motivated, but it happens because that's what they intend to have happen. The question isn't whether they're allowed to cooperate with the police, you started your argument, Ms. Swingle, by saying, and you put it in your brief, that you've got to look at these people separately and there's no plausible way to connect the TSA actors with the police actors, and I'm pressing you on that because it seems less plausible to me that the police show up randomly and cuff them and walk them away and nobody says anything than it is that he comes, the police officer does that, because that's what the TSA tells him to do. Well, and Your Honor, if I may, I'm not disagreeing that there is some basis to think someone within TSA called the police, but the idea that simply asking the police for assistance, we are going to infer from that that that was a request to handcuff Mr. George, to detain him for four hours. Well, but then that gets into the second part of this, then why shouldn't we have discovery here? This is not the normal qualified immunity case, because here, because it's a suit both against the individuals as well as the government, I mean, to the extent that qualified immunity would shield them from going through discovery, and it would usually if they qualify for qualified immunity, the same questions are going to be asked in the context of the suit against the government where they're not going to have qualified immunity, why shouldn't we allow discovery to proceed to see whether or not the plaintiffs can establish enough of a nexus to get an agency relationship between the TSA screeners and the Philadelphia police? Because ultimately, Your Honor, it is the plaintiff's burden to establish that nexus in the pleading as against individuals, and we do not disagree that the claims against the United States remain in the case, and that there will be discovery on those claims, we have not sought interlocutory review, but to move forward with discovery against the individual TSA screeners would require the court to assume that simply because TSA screeners initially questioned and searched Mr. George, and then made a phone call, that the fair and reasonable, plausible inference from that is that they requested the Philadelphia police to come, not only to question him, or perhaps to be present, because if the decision was made not to allow him to board, someone would need to escort him out of that screening area, but instead that they requested that the Philadelphia police come, detain him for four hours, handcuff him. Really? Is that the only thing? Is that the only place you can go? I mean, do they have to prove that that's the only inference, or do they only have to prove that it's plausible that the TSA understood, whether cuffed or not, they were going to detain this man, and that that's, I mean, short of discovery, please, I'm not trying to be difficult, but I am trying to get you to answer this question. You keep saying there's no basis in this record, and I think we're coming back, or I'm coming back to the question, there's no discovery at this point. All they have to allege at this point is it's plausible to believe that the detention that occurred because of the Philadelphia police occurred because the TSA wanted the man detained for further questioning. Now, they don't have to prove everything that happened was their intent or desire, but isn't it enough at the pleading stage that that be a plausible inference? Judge Jordan, if I may answer your question in a slightly different way. In order for that to be a basis for discovery in this case, this court would need to hold, as a matter of Fourth Amendment law, that no TSA official, no competent law-abiding TSA official, could have thought that he was entitled to call the police and ask them to question someone who was there. No, no, because the concern here is that what if the timing here is particularly propitious, it seems to me from the point of view of the plaintiff, it's not only possible, it seems to me likely that you've got the screeners, they have their concern, at least it seems to me, very legitimately and reasonably raised by this guy, and the first 15 to 20 minutes are really inconsequential. But beyond that, he's held for four or five hours in handcuffs until John Doe 1 or Jane Doe, John Doe 4 and John Doe 5, or I'll call them John, I'm not sure if it's John Doe's or Jane Doe's, arrive. It's logical that the screeners said to the Philadelphia police, look, we've got some folks who are members of the Joint Terrorist Task Force, the JTCF folks, they can't get here for four or five hours, hold them until we can get them down here. Now, if that happened, there may well be some kind of relationship that would be relevant to the individual bitman's claim against screeners 1 and 2 and 3. Now, I don't know if that happened, none of us know if that happened, but if the same questions will be asked in the context of discovery against the corporate entity of the federal government, why not allow that discovery against the individuals who would normally be able to escape it because of qualified immunity to get at that? For a number of reasons, Your Honor. First, the Supreme Court in Iqbal and this court in Asiarno have been very clear that discovery when an individual defendant faces personal liability is quite different from discovery in the context of being a critical fact witness, so I don't think it is enough to say that discovery will be going forward here. How would it differ here? But if I may, Your Honor, I do not believe and I don't think this court's decisions establish that the standard under the Fourth Amendment for asking a law enforcement official to come is probable cause. So unless, you know, the theory of liability here is that there was not probable cause to hold him, but we are not saying that. At most, what you can infer from the factual allegations are that the TSA screeners wanted someone additional from the law enforcement community to question him. Well, why, now that's, see, that is the point at which I think you could have a serious disagreement with the other side and which, and is precisely the point I will continue to press you on. You say that there's nothing to indicate that the TSA wanted what followed to happen, but in the absence of some discovery, I mean, let's take it out of the context of this. If you're in a case with excessive force and there's an argument about whether somebody, a police officer punched somebody or not, it's true where nobody likes to say you don't get qualified immunity right now. It deprives you of the benefits of qualified immunity to have to go through discovery and perhaps face trial. But there's a question of fact about whether you punched this person or not, and so we're going to let some discovery go forward, and the government kind of accepts that. If we have a factual dispute or question about whether when the TSA officers contact the Philadelphia police, which it sounds like the government is conceding is what happened, that it didn't occur randomly that the Philadelphia police arrived, that there was either by dint of past behavior and understanding that the person would be in lockup until the question could occur, or there was a specific request that there be lockup, we don't know that, but it's not implausible that there was past action that would lead one to believe you're going to detain this guy, and that that's something that should be explored. What's wrong with that arc of reasoning, which I understand to be part and parcel of what's being pressed on us, and I hear you just dismissing it saying it's implausible. I guess I'm trying to get you to explain to me what's implausible about believing, based on the allegation that the TSA contacted the Philadelphia police and they came and they found him, that that's what the TSA expected because they either asked it or that's how things were done. Well, if I can point to a number of the specific factual allegations that I think are not consistent with the theory that the first two screeners asked the Philadelphia police to detain him until the JTTF could come. First, as you know... Well, get within that number three, because number three was engaged, I guess, in a conversation at the time of the police arrival. It's difficult to understand why, if the only phone call that was ever alleged to have been made in this complaint was by John Does 1 and 2, the first initial, the screeners, right? The first screeners, not the supervisor. It's alleged that they made a phone call. So presumably, as a result of that phone call or another phone call by someone else in TSA, the police came. If we think that they had requested the police to come and detain this man until he could be questioned by JTTF, it is not in any way clear why they would have had a supervisor come and continue to question him, apparently for the purpose of aviation security, because as we know, TSA's only role here is to screen people for clearing... Yeah, I'm just not sure that gets you past the discovery issue, though. What you're arguing makes sense, but it also makes sense that they would have asked the police to come. Meanwhile, a supervisor finds out about it and goes there to have a discussion. What's the logic of that? If I may, Judge McKee, in addition, after the Philadelphia police took him into custody, into detention, as we know, his allegations are that they then made a series of phone calls to a variety of state and federal entities seeking assistance, and that seems to have been entirely... What did the assistance have to do with aviation safety? Well, I have no idea, Your Honor. We obviously don't represent the police here. Do you know that they're concerned more from aviation safety to investigation of whether this person had some other type of threat that needed to be investigated, and they caused him to then be taken in handcuffs and taken and transported to the Philadelphia Police Department? Well, obviously, I don't understand the Philadelphia Police Department's role to be one of aviation security, which is a TSA function. I assume they had some law enforcement interest, but of course, they called both the FBI and also... Didn't you just say a minute ago that it would be unusual to think that TSA and the police wouldn't be cooperating? There is a cooperative relationship, right? There is a cooperative role because, of course, TSA doesn't serve any law enforcement function, so to the extent that there were concerns that he might pose a risk other than to aviation security, yes, it would make sense to call the police, but we have no formal or legal control over the police in those circumstances, and I want to be very clear. Even if Your Honor is correct that one could somehow infer or think it was appropriate to have discovery about what the police were told, there is no support in the law for holding individual Bivens defendants liable for conduct of a separate law enforcement entity, even in some sort of informal cooperative role, so I do urge the court to think hard about the purposes of qualified immunity in this context. Now, they're setting aside whether ultimately there may be qualified immunity and focusing on what the Chief Judge has noted about the discovery point, the point of discovery, is that the government's argument that there are no circumstances conceivable, let alone plausible, there are just no circumstances conceivable where individual TSA employees could be liable for or co-culpable with a constitutional tort committed by the Philadelphia Police. I think we have two points on that, Your Honor. Obviously, our initial point is that there just are no facts here that would support that. I understand you're saying that again. But yes, I do think we would take the view that the acts of the Philadelphia Police, where there's no allegation of and no evidence of any kind of formal legal relationship between them, no one's acting in a deputized manner, that that would be enough. So if the TSA supervisor called and said, Officer Smith, come up here, will you? We've got this guy, he's got bomb written on note cards, terrorists written on note cards, he's carrying around anti-American literature. We can't handle him right now. We want the Terrorism Task Force people to talk to him. Lock this guy up, will you, until somebody can talk to him, because we can't handle him. Would you just take him and lock him up? Is it the government's view of the law that if the Philadelphia Police under those circumstances said sure, we'll take him to our lockup, that the individual TSA person, assuming all the other things about qualified immunity that might apply, that that's not enough to say there could be culpability? It is our view that there is no support in the law that a mistaken request to the police to arrest somebody would be a basis for individual Bivens liability under the Fourth Amendment. Mistaken, I think you've put it back on the table. I'm saying assume away all good faith mistake, no reasonable officer, take for purposes of this question, because I'm trying to get at your assertion. Your assertion is short of deputizing, formal deputization, there's no way that the TSA officers could be responsible for what happened next. That's your assertion, right? That is, in fact, our position, but I think the court doesn't need to reach it because of our view of the facts. And I just would urge the court to look at what's alleged. What would be required to accept what the district court did here is to read the factual inference, the facts in this complaint, just the facts and the inferences, to support an But they ask the police to come to detain him and to take him away and hold him for four hours, or that somehow, simply by asking the police for help, whatever happened afterwards could be held, could be attributed to them. And I don't think there's any support in the case law for that either. Can we save some time, I think, for about a moment? Yes. Let's take a brief break and then we'll hear from Mr. Is it Castnelson? Is that how you pronounce it? Okay, thank you. Take about a five minute break. Okay. Good morning, your honors, may it please the court, I'm Zachary Castnelson on behalf of the elite, Nick George. Your mic doesn't sound like it's on. Maybe you can pull it up a bit or pull it closer to you. Sure. Is that better? Not a lot better. Maybe it's just me. Should I just shout, maybe? Yeah, okay. I'll speak up. Then you'll get that noise back again. Sure. And you won't be able to breathe, so that won't work. So, thank you. You're conceding that the initial exchange is okay. I guess your concern is, was it the time the handcuffs were placed on him and he's put in detention from that point forward, you're saying they had to have probable cause to arrest? Well, we certainly say, absolutely, they need to have probable cause to arrest. We do also, though, contend that Mr. George, at the point that the TSA screeners, the initial screeners, determined he had no weapons or explosives, that they did not have a basis to detain him. Well, let's pursue that. So, and there's no allegation that they ever asked anything about the books or the materials specifically except for this ridiculous conversation about what language this was, how bin Laden would speak. But are you alleging that he was held then just because of the materials that he was carrying? We absolutely are. I understand, Your Honor. So, to what extent would the First Amendment protections give way to a Fourth Amendment security interest in terms of an administrative search? Let's assume, for example, that rather than having what he had, to get at the legal issue, he had a pamphlet that said something like, Jihad to the American Integrals, or in another magazine that had an article in it that said something like, Osama bin Laden was right, something like that. Now, clearly, you have a First Amendment right to read that material. You probably have a First Amendment right to get on the airplane with it, but you don't have a Fourth Amendment guarantee that would keep you from getting interrogated before you get on that plane. To what extent does your First Amendment claim become subsumed into your Fourth Amendment claim? Why are they separate here? So, I can answer maybe two ways. The first is that the First Amendment materials were the basis on which the government chose to detain and arrest Mr. George. But you can see that detention's okay, even though the First Amendment is there. Initial detention. The initial secondary screening, we contest, is okay. But when the secondary screening under clearly established law, in this circuit and Hartwell, the Ninth Circuit, and Al-Qaeda and Marquez, airport checkpoint cases, they clearly delineated the limits of the warrantless airport search. It's for weapons and explosives. But why is that? And the issue wasn't really presented in either of those cases. Al-Qaeda just talked about consent not really entering into the equation at all. Why would the Fourth Amendment administrative search under Hartwell be limited to just weapons or explosives? Why wouldn't there also be a corresponding duty to determine whether or not this is someone who is just going to be a danger if he or she gets on board that airplane? I think the purpose behind allowing that carve out from usual Fourth Amendment requirements of the least reasonable suspicion to detain somebody, is the courts have held there need to be neutrally applied criteria, that carve out neutrally applied criteria, that they need to be carefully cabined. If the TSA agents have reasonable suspicion, based on First Amendment materials or otherwise, so based on your jihadi favorable materials, however you want to characterize them, if they have reasonable suspicion, we do not object to their detaining Mr. George. But we argue they did not in this context. Your assertion is that this can't, the fact that he's got the note cards with the troubling words on them, and that he's got a passport stamped with travel through the Mideast, that those things don't give rise to a reasonable suspicion in the Terry sense, warranting some further limited detention to talk to the man further. That's the position you've got? That is the position we have, yes, Your Honor. So at what point is it going to be enough in the view that you advocate for them to phrase a single word, bomb, or terrorist, he had a note card that said, I'm a terrorist and this is a bomb. Would you say that's reasonable suspicion? Potentially, absolutely, yes. So it's the fact that bomb and terrorist are on two separate cards that make the difference between it being lawful and unlawful, the detention, in your view? Of course, any reasonable suspicion inquiry is about the totality of the circumstances. And in this instance, you had a pack of English-Arabic flashcards that are clearly being used to learn a language. There is nothing in the complaint, incidentally, that the TSA officials took into account at all, his travels. They have possession of his passport, their nick didn't question him on any of the travels. Can we make, are we, just as we should make inferences that are plausible for your client, shouldn't we make reasonable inferences based on what you yourself have alleged? If you go through the TSA line and you hand over your passport, isn't it perfectly reasonable to believe that they look at the passport? There is a reason, absolutely, it's possible. But at this stage, it's possible, but completely reasonable to believe they look at the document that they're handed. If the government wants to proffer alternate explanations, that, we would argue, is an issue for discovery and to get to the bottom of the factual issues. It's not even, is that an alternate, is that a dispute of fact? You're, are you telling me that you allege in your complaint that nobody ever looked at my passport? We, as the complaint, as we have plotted in the complaint, the cards were the key factor as to why they chose to detain Mr. George. Let's assume for a minute that the passport did play a role. The Supreme Court has made clear that you need to consider factors in terms of determining whether or not you have reasonable suspicion. You need to use factors that do not describe large numbers of innocent people, that they will not be then swept in and potentially detained at random. Are there large numbers of people showing, with passports showing, immediate travel through countries known to have terrorist problems and carrying flashcards that say bomb, terrorist, kidnapping on them in Arabic and English? Is that, is a ruling that that gives rise to reasonable suspicion going to sweep up large numbers of innocent people, you think? Well, I think in terms of the travel, large numbers of people, State Department employees, journalists, professors, lots of people travel to the Middle East. Sure. Right? And so it would sweep up potentially large numbers of folks, many of them who may be learning Arabic, to try and communicate better, to try and learn more about that area of the world as Mr. George was doing. So ultimately, a suspicion which is reasonable can be dissipated by explanation, certainly. But is it the contention that you're making that the fact that you can dissipate a reasonable suspicion with discussion means you don't have reasonable suspicion to start with? We're just, the point you're focused on, or I take it you're focused on, is once that administrative search ended, and in your view as I understand it, that ended as soon as they looked in his bag the second time and said, no gun, no bomb. That after that, it was all bad. And I'm puzzled by that, for I think the reasons Chief Judge McKee's point, couldn't you have, what if he was carrying a manual that said, how to fly a 747 by Mohammed Atta? Would that not be the sort of thing, it's not a gun, it's not a bomb, but the sort of thing that would make a reasonable government official say, that's a problem, I've got to talk to this person some more. And I'm out of administrative search now, I'm into reasonable suspicion. It's not a weapon, but it gives me the right to hold this person and talk to him. I think that's of course a different scenario than we've put in our complaints, and we need to be focused here on the facts in this complaint, at this stage. Sure, but you've made a legal argument that only guns, only bombs, only weapons can justify the sort of further detention that might happen, or at least, maybe I've misunderstood. Can justify a warrantless search, essentially a search and detention without reasonable suspicion or probable cause. So we're not saying that of course the TSA, if they have reasonable suspicion to believe that somebody is a threat, and there's reasonable suspicion they're about to commit a crime, of course, right? Right. That they have reasonable suspicion in that regard, of course they can detain that person for proper questioning. So the question is, is this complex of facts that you've alleged sufficient to give rise to reasonable suspicion? We allege no. But that troubles me, because even in Terry, where the reasonable suspicion in Terry gets you the initial stop, and I think that was part of the confusion the district court had, this to me is not a Terry stop at all. It's an administrative search, as we said, at Hartwell, and that's a very different focus, different inquiry than you have in Terry in all of the cases that talk about drug screening at airports. It's just very different than Guaro and that line of cases, at least in my mind. If reasonable suspicion is necessary, the reasonable suspicion would not be dissipated just because the person doesn't have a gun or a bomb on them. There may be reason to follow up with initial inquiry to find out, what have I got here? And I don't have anybody who's got a bomb or a gun, but what exactly am I dealing with? Take Judge George's example. What if you'd stopped Mohammed Ada, and he had a detailed manual on how to fly a 747? You say, well, he doesn't have a gun or a bomb. That is no problem. I'm just going to let you, I don't know if he was a Logan or Kennedy, but go ahead, and if you're in the exit aisle, you've got to be able to answer certain questions in English, but otherwise, have a seat on the plane, and enjoy a sweet and savory snack, as they always say. But that wouldn't make any sense in the context of what justifies an administrative search. And the other problem, this is a very long, I'm hoping there'll be a question at the end of this, Mr. Kaspelson, but at least I'll share my concerns with you. One of the misfocuses here, it seems to me, is that the whole purpose for the administrative detention, or administrative search, if you will, is the balancing of the public interest for security against the private interest in privacy, the Fourth Amendment private interest. That's very different in the context of administrative airport screening than it is when doing a drug profiling search, as you might have in Guaro. Because there, if you make a mistake, the only thing that happens is somebody's getting on the plane with some drugs in their pocket, and there'll be some drugs on the street wherever that person is going. And that's something a society can live with, and so you decide, well, the risk of error is not so great there. So you let the person go, and you can't engage in this kind of screening. In this context of the administrative search, the balance, it seems to me, is very, very different, because the risk, it's on the public interest side of that scale, is horrendously and exponentially different than the risk of somebody getting through security with five grains or five grams of crack on them. There's just no comparison. So why would all of the kinds of approaches where you look at reasonable suspicion, and once you satisfy yourself to the reasonable suspicion, you must release the person, why would that line of cases play here? I did get a question at the end of that, but I think you understand my concern. I do, I do absolutely understand Your Honor's concern. And of course, we never disagree that air safety is critical. But there are, all the cases have held, including the Hartwell case, that the Fourth Amendment continues to apply in this context. And so I will, I still stand by absolutely that we believe in administrative search. But the test that's reasonable under the Fourth Amendment is strictly reasonable in this test, under all the circumstances. So I would say, even if we presume, for the sake of this discussion, that they had reasonable suspicion, what happened to Mr. George was that he was in fact arrested, right? You said perp walked Judge Jordan through the airport, right? And put in a jail cell, two hours in cuffs in the cell. He was arrested, so there was not probable cause. Even if you were to presume that they had reasonable suspicion to detain him in the first place, and the TSA officials, by the plausible allegations in the claim, are the ones who directed, asked for, that arrest. Well, that's a good question. Well, there you go. That's a good question. And here's my, well, go ahead, finish your question. I was just going to say, thank you, Your Honor, that just to say that the detention clearly violated Mr. George's rights, and that the... The detention or the arrest? Because, I mean, there's... The arrest. The arrest. I'll clarify. The arrest. So, because we believe certainly when the police arrived and put him in cuffs, from that point forward, he had been arrested. So the arrest absolutely was without probable cause. Even if you could presume there was probable cause, the manner in which he was held, the duration in which he was held, and the Doze 4 and 5 certainly are responsible for that as well. He was being held at their request. Why are the Doze 4 and 5 responsible for that? They get there, I think, they inquire less than 20 to 30 minutes. Why are they responsible for the whole four or five hours in police custody? Because as we allege in the complaint, and of course the inferences need to be taken in our favor at this point, and the facts is true, that the phone call was made to them. All the cases that talk... And they took... It was still four hours later that they actually arrived and questioned Mr. George. All the cases that deal with investigatory detentions, the Supreme Court has never held them in detention of more than 90 minutes. In a drug case. It was legitimate. But there, in this case, again, it wasn't TSA was holding... I've been in that little police station in the airport. Not in Seoul, but... Thank you for clarifying. In the parking pass. And there was nothing other than you go in there, there's a big sign, Philadelphia Police Department. You go into the office and there's a glass door and there's Philadelphia police officers and each hit the glass and there's several of them sitting back having the mandatory donuts on the desk. But there's nothing to suggest TSA that it's a Philadelphia Police Department operation. And that's where he was held. Absolutely, it was where he was held. The TSA, we allege, TSA requested, directed his arrest. The officials, the cases are about diligent... You've got to stop there. I've got to stop you there. Okay, please. I can, for purposes of discussion, let's say it's plausible to say that TSA wanted Mr. George detained for some further questioning. What is it that makes it plausible in what you've alleged that they wanted him handcuffed and locked in a cell with his hands behind his back for two hours and another two hours after that? Isn't that just like a completely speculative leap? What have you got that indicates in any way, shape, or form that the TSA officers intended, wanted, planned, participated in any way in that behavior? I think the allegations, as we've alleged, the reaction is key. They... It does not make any sense, as you said, that the police arrived on the scene without the call from TSA. Sure. They call them. They call them. And what I'm trying to get you to do is respond to Ms. Swingle's argument, which I understand to be, and she can clarify it if she'd like. I understand it to be, sure, they call because they need some help of some sort. Somebody contacts the police for some help. And they need some further detention for further questioning. But how do you get from there to, and we really want you guys to perp walk him through the whole airport cuffed and leave him in a cell for four hours. Isn't that a leap? Is that a leap beyond the plausible? How do you get there? I think it's plausible that under the operations, the relationship between TSA and the Philadelphia police, that when the TSA calls the police to take someone into custody, that they would put them in cuffs and take them to the police station, put them in the cell. Now, that is an issue for discovery. We're obviously here asking you to decide, it's a question of law, whether or not what the individual defendants did justifies qualified immunity, as to the exact policy of what TSA has, their relationship with the Philadelphia police. And given the reactions, as we've pled, of the TSA agents, they didn't protest in the least, as to how Mr. George is doing. But that's pushing it. Why in the world wouldn't they, wait a minute, wait a minute, you can't put this guy in cuffs, you've got to let him get on the airplane, is that? But if the issue is the manner in which they're taking him away to be further detained, they could have, certainly could have objected at that point. They were silent. But that doesn't give rise to an agency. They don't have an affirmative obligation to step in and say, wait, you can't do that to him. The fact they did not, they stood there and let it happen, watched him being cuffed and walked out, that doesn't give rise to an agency. I don't think you have to go that far to get an agency, but that certainly doesn't give rise to an agency. I think the inference is that that was the expected mode of operation by the Philadelphia police when they would arrive. And that if discovery proves differently, or if discovery would have proved otherwise, then that's a different story. Well, even if it's expected, I'm not sure. It seems to me it would be expected. I'm not sure that gets you agency. I think that's what Ms. Springle is arguing. Again, please correct me if I'm wrong. But the fact that the TSA folks know that when the police show up, they have the arrest authority, TSA doesn't, so it's logical to assume when the police show up, this guy is going to be arrested. That does not make the Philadelphia police the agents of the TSA just because TSA knows what Philadelphia is going to do. But if the TSA agents, as we've put, and the only plausible explanation I believe in this complaint is that the TSA agents asked the police to come. So therefore, there is the agency link. They know what's going to happen. They ask for it to happen. They direct the agency to proceed. Yes, Your Honor. If I can impose on my colleagues here for a couple more questions. I'd like you to respond to this language from Florida versus Royer. There are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more private area. So if the Supreme Court has sanctioned, and it sounds like they have, moving somebody from a screening area to some more private spot for further investigatory detention, is it or is it not the case that the TSA can call the Philadelphia police with every intention that he be moved and he, in fact, be detained, but not want or intend or plan or direct how that's to happen? In Royer, the Supreme Court held that there had been an arrest in that instance and that there was not probable cause. Sure. I'm trying to get you to focus not on the arrestees, but here they're talking about Terria and a line of cases associated with Terria and investigatory detention. And the line that the Supreme Court drew there was that even if there was reasonable suspicion to detain, you need a separate probable cause. And the movement to that separate room was indication of the arrest. And the safety concerns they talked about, now, of course, you could come up with different scenarios. The safety concerns they were talking about were safety to the officers, perhaps losing control of the luggage they wanted to search. Mr. George was entirely cooperative throughout this entire experience. He never once threatened a single person. He answered any question they had. He posed none of those threats at all. Okay. It's true that in Royer, the court said the facts of that case are such that it wasn't an investigatory detention. It was an arrest. But they are positing, and this is what I'm trying to get you to respond to, they posited in the language I quoted to you that something short of arrest, an investigatory detention, could, quote, undoubtedly involve taking somebody from where you're talking to them, moving them someplace else, and continuing the questioning someplace different. And that that would not be an arrest. Right? That's the language of Royer. It is unquestionably a totality of the circumstances test. Yes. So I understand the government's position to be you shouldn't listen to what the plaintiff is saying here, court, because he's wrongly trying to get you to hold culpable the TSA screeners for stuff that they, there's no reason to believe, nothing in the complaint would have you believe they wanted an arrest. They wanted further detention for investigation. And to make the leap to arrest is unwarranted. I guess I'm trying to get you to respond to that, if I could get you to. Sure. Sure. I would say, as we've discussed, plausible inference is that the TSA calls the police and asks them to come. Sure. Right? The plausible inference is that TSA, as the government has contended, they have a longstanding relationship with the police. They work in concert all the time. TSA will certainly know what means the police use when they take someone into custody for They will know how the police act. That's the plausible inference. They will know that they put someone in cuffs, they walk them through the airport, they put them in a jail cell. That is, we would contend, that is the plausible inference of the facts in our complaint. Okay. Thank you very much, Judge Jordan. Thank you, Your Honors. Yes, Your Honor. Ms. Wengel? Thank you, Your Honors. If I could start with Judge Jordan's final round of questioning. I do think on the facts here, even if one accepts the proposition that the individual TSA screeners could be somehow attributed the conduct of the Philadelphia police here, as best we know, those TSA screeners might have understood that police would come. But I think the mere fact that the Philadelphia police took Mr. George away is not a basis for attributing the four-hour period of detention. They were in a secure screening area. It would be perfectly reasonable for police to take Mr. George out of that airport screening area to somewhere else to question him further. So the mere fact that he was taken away by the police and handcuffed is not enough to attribute to them some kind of arrest. And if I may, I think the appropriate Fourth Amendment standards here are not the standards for a Terry Frisk and investigative detention. I think the closest analog is actually border searches, which are also administrative searches and have been tied in the case law with airport searches. And it is commonplace in a border search for an individual to be taken from the place of initial screening to somewhere else for secondary screening. It is commonplace for that to happen with handcuffs being used to transport the person to the other place. I would be happy to provide some citation support to the court, but that has never been held to require probable cause. You've heard my exchange with Mr. Katznelson, and maybe you can help me with this. Frankly, at least for myself, I totally agree with you that this is not – the Terry lines of cases are an invitation to go down a rabbit hole in this inquiry. It's just not appropriate. It's much more akin to, as you suggest, a border search. Because even for Terry, you need individualized, articulable suspicion. You do not need that for a border search or for an administrative search under Hartwell. Everybody goes through it. And let me add that in the border search context, those secondary screenings routinely have been upheld even where they last for multiple hours. But wouldn't you draw the line? Let's assume – and I know you're going to vehemently, with every fiber of your being, you're going to resist this hypothetical. But try to get over it, all right? Let's assume – just engage me. Fantasize here with me for a second. Let's assume that they could establish an agency relationship on the part of the Federal Police Department and the GSA. Now, I know that's going to upset you the rest of the day, but just bear with me. Assume that. Why do we draw the line? It seems to me there's got to be some limitation. You can't hold someone in Guantanamo Bay until you figure out what the hell this person's about, because they had some literature that looks like this person totally disagrees with the policies of the federal government in the Middle East. How do we restrict the ability of the government, assuming the agency relationship, to hold someone under Hartwell for administrative detention once they see no bombs, no weapons? How long and under what circumstances can they detain someone to investigate whether or not they should let that person go forward? You know, Your Honor, I think that question is squarely presented in the district court claims brought against the Philadelphia police and potentially against the United States. I know. And now I see you're resisting. I knew we weren't going to be friends after this exchange. Just help me out here. If I may, Your Honor. Just pretend you're the lawyer for the Philadelphia police. We don't take any view about the lawfulness of the period. I'm sorry. We don't take any view in this appeal. We have not sought to defend the lawfulness of his four-hour holding by the Philadelphia police. I think our position is there has to come a point at which TSA screeners who need to be able to call local police just to fulfill their normal everyday functions. Surely we don't want to discourage screeners who have a problem from seeking help. There needs to come a point at which they are not responsible for what happens afterwards. You should have been in the debate the other night. I'm asking you one question and you're giving me a very, very nice and fluent answer to a question that I never asked you. But I just, we don't have a position. I am not authorized to take a position about the point at which how many hours it would take. Well, I'm not going to call your supervisor and dime you out. I promise. I promise. Just TSA folks here. I would like some help with that inquiry. Because there's got to be a limit on it. And I have no idea. We don't disagree with that, Your Honor. But please, I ask the court to remember the capacity I am here in today. I remember. That's why I apologize for putting you in this position. I will say, you know, to the extent we have case law that bears on it, you know, obviously it's relevant whether it's a question of aviation security that's at issue or whether he's been held for law enforcement purposes. I think that's not clear on the record before the court. And certainly as to the claims against the Philadelphia police, that would be highly relevant. Well, is it your view, leave out the period of time part, is it your view that because this occurred at an airport, it couldn't be an arrest? The fact that you're in cuffs in a jail cell makes it nothing more than an investigatory detention? It is not, Your Honor. I think our point is almost exactly the opposite of that. It's simply that the fact that he was taken away in handcuffs to somewhere else cannot tell you that the TSA individuals intended for him to be arrested. They might have simply thought he was being moved to be questioned somewhere else. What's your response to the assertion from Mr. Katzenhausen that it is a plausible inference that because these people do work together regularly, they know when they call the cops and say, please take this fellow away, we have to question more, that it's going to involve handcuffs and bars? I think there is absolutely no factual support in the record for that at all. I think it is just completely speculative. There's nothing. And, you know, we know that TSA and the police work together only because I have stood up this morning and told you that. It just is a matter of common knowledge, but I don't think there's anything even within common knowledge that would lead you to conclude based on anything more than pure speculation that they work together to arrest people. I mean, local law enforcement officials in this context do a whole variety of things in airports, and I just, there's nothing more we can take away. If I might, I know I'm out of time, but just to make one final point for the court, we have not talked really this morning about John Doe's 4 and 5, the FBI officials, but I think even if the court disagrees with our arguments about the TSA screeners, there is no basis in the factual allegations to make those two individuals responsible for this entire period of detention that came before. I did ask about it. I asked for about 15 to 20 minutes, or 30 minutes, I guess, and they determined this guy is not arrestable. Exactly. All that we know is the Philadelphia police called them. We don't know how long they waited before calling them.  We don't know how long it took for them to come. They asked questions for 30 minutes. The game they saw, they released. Exactly. And I think there's nothing that would support the district court's willingness to those individuals. Okay. Thank you. Thank you very much. This has been a great, interesting case to say the least. Thank you, Madam, for the advisement.